**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**
**VICINAGE OF NEWARK**

| | |
|---|---|
| **ROSEMARY SCIARRILLO, by and through her guardians, Joanne St. Amand and Anthony Sciarrillo,** | : <br> : <br> : <br> : <br> : |
| **JOYCE BANOS, by and through her guardian, Peter Banos,** | : <br> : <br> : |
| **ROBERT JOHN BARRETT, by and through his guardians, Robert and Carol Barrett,** | : <br> : <br> : <br> : |
| **CHARLES DAVID CHRISTENSEN, by and through his guardian, Daniel Christensen,** | : <br> : <br> : <br> : |
| **ARLEEN BRAUSE, by and through her guardians, Joseph Fass and Harriet Fass,** | : <br> : <br> : |
| **KENNETH COOPER, by and through his guardian, Minnie Cooper,** | : <br> : <br> : |
| **VINCENT GALLUCCIO, by and through his guardian, Domenica Galluccio,** | : <br> : <br> : <br> : |
| **RODNEY HAMMOND, by and through his guardian and his brother, Carrie Hammond and Walter Hammond,** | : <br> : <br> : <br> : |
| **SHARON KNAPP, by and through her guardians, Barry Knapp and Maria Knapp,** | : <br> : <br> : <br> : |
| **RICHARD SARAO, by and through his guardian, Mary Tritt,** | : <br> : <br> : |
| **CHERYL GORDON, by and through her brother, Joseph Gordon,** | : <br> : <br> : |
| **PETER CANALE, by and through** | : |

his guardians, Steven Canale and    :
Maria Canale,    :
    :
LINDA GRAVES, by and through her    :
parents, Shirley and Billie Graves,    :
    :
DIANE O'BRIEN, by and through her    :
guardian, Fred O'Brien,    :
    :
THOMAS MARINELLO,    :
by and through his guardians,    :
Jean Marinello and Jody Sorge,    :
    :
MAUREEN DORAN, by and through    :
her guardians, Kathleen DeCicco    :
and Lori Centrella,    :
    :
KERR MITCHELL, by and through    :
his guardian, Juana Mitchell,    :
    :
EUGENE CARR, by and through    :
his guardian Marylyn Carr,    :
    :
LEAH WRIGHT, by and through    :
her guardian, Elizabeth Wright,    :
    :
CATHERINE O'BRIEN, by and through :
her guardians, Donald and Virginia    :
O'Brien and Susan Mason,    :
    :
JACQUELINE FRIEDMAN, by and    :
through her guardians, Sam Friedman    :
and Gail Friedman,    :
    :
PAUL DITTAMO, by and through his    :
mother, Wendy Dittamo,    :
    :
CLAYTON DAVIS, by and through his    :
guardians, Rose Seyler and    :
Dorothy Davis,    :
    :
STEPHEN SCOTT DYER, by and    :
through his guardian, Peter Dyer,    :
    :
SUSAN GRIFFIN, by and through her    :
guardian, Barbara Columbo,    :

|  |  |  |
|---|---|---|
| | : | |
| **EUGENE KESSLER, by and through his** | : | |
| **guardian, Frances Finkelstein,** | : | |
| | : | |
| **PHILIP CONKLING, by and through** | : | |
| **his guardian, Caroline Conkling,** | : | |
| | : | |
| **RALPH GRZYMKOWSKI, by and** | : | |
| **through his guardians, Dana and** | : | |
| **Mirek Grzymkowski,** | : | |
| | : | |
| **MARY ELLEN SCESA, by and through** | : | |
| **her guardians, Kathleen and Louis Scesa,** | : | |
| | : | |
| **ALICE TUCKER, by and through** | : | |
| **her guardian Bertha Westbrock,** | : | |
| | : | |
| **STEPHANIE ROOTS, by and through** | : | |
| **her guardian, Marie Reid,** | : | |
| | : | |
| **KESHA SMITH, by and through her** | : | |
| **guardian, Deborah Smith,** | : | |
| | : | |
| **ANDREW SEKELA, by and through** | : | |
| **his guardian, Winifred Sekela,** | : | |
| | : | |
| **PAUL VACCA, by and through** | : | |
| **his guardians, Donald and** | : | |
| **Theresa Vacca,** | : | |
| | : | |
| **RALPH VERLEUR, by and through** | : | |
| **his guardian, Else Verleur,** | : | |
| | : | |
| | : | **CIV. NO.:** |
| | : | |
| **Plaintiffs,** | : | **COMPLAINT** |
| **v.** | : | **[DEMAND FOR JURY TRIAL]** |
| | : | |
| **CHRISTOPHER CHRISTIE, as** | : | |
| **Governor of the State of New Jersey;** | : | |
| **NEW JERSEY DEPARTMENT OF** | : | |
| **HUMAN SERVICES; JENNIFER** | : | |
| **VELEZ, as Commissioner of the New** | : | |
| **Jersey Department of Human Services;** | : | |
| **NEW JERSEY DEPARTMENT OF** | : | |
| **HUMAN SERVICES DIVISION OF** | : | |

DEVELOPMENTAL DISABILITIES;　　:
DAWN APGAR, as Deputy　　　　　:
Commissioner/Acting Assistant　　:
Commissioner of New Jersey Department :
of Human Services Division of　　　:
Developmental Disabilities; NORTH　:
JERSEY DEVELOPMENTAL　　　:
CENTER; WOODBRIDGE　　　　:
DEVELOPMENTAL CENTER,　　　:
　　　　　　　　　　　　　　　　:
　　　　　　　Defendants.　　　: 　　　　June 5, 2013

## COMPLAINT

The Plaintiffs, **ROSEMARY SCIARRILLO,** by and through her guardians, Joanne St. Amand and Anthony Sciarrillo; **JOYCE BANOS,** by and through her guardian, Peter Banos; **ROBERT JOHN BARRETT,** by and through his guardians, Robert and Carol Barrett; **CHARLES DAVID CHRISTENSEN,** by and through his guardian, Daniel Christensen; **ARLEEN BRAUSE,** by and through her guardians, Joseph and Harriet Fass; **KENNETH COOPER**, by and through his guardian, Minnie Cooper; **VINCENT GALLUCCIO,** by and through his guardian, Dee Galluccio; **RODNEY HAMMOND,** by and through his guardian and brother, Carrie Hammond and Walter Hammond; **SHARON KNAPP,** by and through her guardians, Barry and Sharon Knapp; **RICHARD SARAO,** by and through his guardian, Mary Tritt; **CHERYL GORDON,** by and through her brother, Joseph Gordon; **PETER CANALE,** by and through his guardians, Steven Canale and Maria Canale; **LINDA GRAVES,** by and through her parents, Shirley and Billie Graves**; DIANE O'BRIEN,** by and through her guardian, Fred O'Brien; **THOMAS MARINELLO,** by and through his guardians, Jean Marinello and Jody Sorge; **MAUREEN DORAN,** by and through her guardians, Kathleen DeCicco and Lori Centrella, **KERR MITCHELL,** by and through his guardian, Juana Mitchell; **EUGENE**

**CARR,** by and through his guardian Marylyn Carr; **LEAH WRIGHT,** by and through her guardian, Elizabeth Wright; and **CATHERINE O'BRIEN,** by and through her guardians, Donald and Virginia O'Brien and Susan Mason, **JACQUELINE FRIEDMAN,** by and through her guardians, Sam Friedman and Gail Friedman; **PAUL DITTAMO,** by and through his mother, Wendy Dittamo; **CLAYTON DAVIS,** by and through his guardians, Rose Seyler and Dorothy Davis; **STEPHEN SCOTT DYER,** by and through his guardian, Peter Dyer; **SUSAN GRIFFIN,** by and through her guardian, Barbara Columbo; **EUGENE KESSLER,** by and through his mother, Frances Finkelstein; **PHILIP CONKLING,** by and through his guardian, Caroline Conkling; **RALPH GRZYMKOWSKI,** by and through his guardians, Dana and Mirek Grzymkowski; **MARY ELLEN SCESA,** by and through her guardians, Kathleen and Louis Scesa; **ALICE TUCKER**, by and through her guardian, Bertha Westbrock; **STEPHANIE ROOTS,** by and through her guardian, Marie Reid, **ANDREW SEKELA,** by and through his guardian, Winifred Sekela; **KESHA SMITH,** by and through her guardian, Deborah Smith; **PAUL VACCA,** by and through his guardians, Donald and Theresa Vacca; **RALPH VERLEUR,** by and through his guardian, Else Verleur; by their undersigned attorneys, aver the following:

## JURISDICTION

1.      This action is for declaratory and injunctive relief under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132, the Rehabilitation Act of 1973, 29 U.S.C. § 794(a) ("Section 504"), the Medical Assistance Program authorized by 42 U.S.C. 1396, et seq., and the United States Constitution.

2.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1342, and 1343. Plaintiffs' claims for declaratory and injunctive relief are authorized under 28 U.S.C. §§ 2201-02 and 42 U.S.C. § 1983 and the waiver of state sovereign immunity enacted in 42 U.S.C. § 2000d-7(a)(I) and various Medicaid federal statutes and regulations incorporated into New Jersey law.  At all times relevant to this action, Defendants have acted under color of state law.

### VENUE

3.      Venue lies in the District of New Jersey pursuant to 28 U.S.C. § 1391(b), and in the Newark Division, because the Plaintiffs officially reside in Northern Middlesex and Passaic Counties, New Jersey.

### NAMED PLAINTIFFS

4.      ROSEMARY SCIARILLO is a 58 year old female (d/o/b 3/13/1955) with profound intellectual disabilities who resides at the Woodbridge Developmental Center in Woodbridge, NJ.  Rosemary brings this lawsuit by and through her sister and brother and legal guardians, Joanne St. Amand and Anthony Sciarrillo.  She has resided at WDC for approximately 38 years.

5.      JOYCE BANOS is a 55 year old female (d/o/b 4/28/1957) with a diagnosis of profound mental retardation who resides at the Woodbridge Developmental Center in Woodbridge, NJ.  Joyce brings this lawsuit by and through her brother and legal guardian, Peter Banos.  She has resided at WDC for approximately 42 years.

6.      ROBERT JOHN BARRETT is a 56 year old male (d/o/b 1/24/1957) with a diagnosis of profound mental retardation who resides at Woodbridge Developmental Center in Woodbridge, NJ.  Robert brings this lawsuit by and through his parents and legal guardians, Robert and Carol Barrett.  He has resided at WDC for approximately 46 years.

7.      CHARLES DAVID CHRISTENSEN ("DAVID") is a 66 year old male (d/o/b 5/15/1946) with a diagnosis of profound mental retardation who resides at the Woodbridge Developmental Center in Woodbridge, NJ.  David brings this lawsuit by and through his brother and legal guardian, Daniel Christensen.  He has resided at WDC for approximately 48 years.

8.      ARLEEN BRAUSE is a 62 year old female (d/o/b 6/13/1951) with intellectual disabilities who resides at Woodbridge Developmental Center in Woodbridge, NJ.  Arleen brings this lawsuit by and through her sister and brother-in-law, and legal guardians, Harriet and Joseph Fass.  She has resided at WDC for approximately 48 years.

9.      KENNETH COOPER is a 58 year old male (d/o/b 12/5/1955) with a diagnosis of severe mental retardation who resides at the Woodbridge Developmental Center in Woodbridge, NJ.  Kenneth brings this lawsuit by and through his mother and legal guardian, Minnie Cooper. He has resided at WDC for approximately 49 years.

10.      VINCENT GALLUCCIO is a 38 year old male (d/o/b 5/14/1975) with severe mental retardation who resides at Woodbridge Developmental Center in Woodbridge, NJ. Vincent brings this lawsuit by and through his mother and legal guardian, Dee Galluccio.  He has resided at WDC for approximately 25 years.

11.      RODNEY HAMMOND is a 58 year old male (d/o/b 7/7/1955) with a diagnosis of severe mental retardation who resides at the Woodbridge Developmental Center in Woodbridge, NJ.  Kenneth brings this lawsuit by and through his mother and legal guardian,

Carrie Hammond, and his brother, Walter Hammond.  He has resided at WDC for approximately 30 years.

12.     SHARON KNAPP is a 67 year old female (d/o/b 5/13/1946) with a diagnosis of severe mental retardation who resides at Woodbridge Developmental Center in Woodbridge, NJ.  Sharon brings this lawsuit through her brother and legal guardian, Barry Knapp, and her sister-in-law, Maria Knapp.  She has resided at WDC for approximately 48 years.

13.     RICHARD SARAO is a 55 year old male (d/o/b 5/1958) with a diagnosis of profound mental retardation who resides at the Woodbridge Developmental Center in Woodbridge, NJ.  Richard brings this lawsuit by and through his mother and legal guardian, Mary Tritt.  He has resided at WDC for approximately 48 years.

14.     CHERYL GORDON is a 60 year old female (d/o/b 3/28/1953) with a brain injury diagnosis who resides at the Woodbridge Developmental Center in Woodbridge, NJ.  Cheryl brings this lawsuit by and through her brother, Joseph Gordon.  She has resided at WDC for approximately 8 years.

15.     PETER CANALE is a 55 year old male (d/o/b 12/30/1958) with intellectual disabilities who resides at the Woodbridge Developmental Center in Woodbridge, NJ.  Peter brings this lawsuit by and through his brother and sister, legal guardians, Steven Canale and Maria Canale.  He has resided at WDC for approximately 45 years.

16.     LINDA GRAVES is a 50 year old female (d/o/b 10/7/1963) with intellectual disabilities who resides at the Woodbridge Developmental Center in Woodbridge, NJ.  Linda brings this lawsuit by and through her parents, Shirley and Billie Graves.  She has resided at WDC for approximately 29 years.

17.     DIANE O'BRIEN is a 53 year old female (d/o/b 11/2/1960) with a diagnosis of profound retardation who resides at the Woodbridge Developmental Center in Woodbridge, NJ. Diane brings this lawsuit by and through her father and legal guardian, Fred O'Brien.  She has resided at WDC for approximately 47 years.

18.     THOMAS MARINELLO is a 56 year old male (d/o/b 5/5/1957) with intellectual disabilities who resides at the Woodbridge Developmental Center in Woodbridge, NJ.  Thomas brings this lawsuit by and through his mother and sister, legal guardians, Jean Marinello and Jody Sorge. He has resided at WDC for approximately 52 years.

19.     MAUREEN DORAN is a 68 year old female (d/o/b 2/7/1945) with intellectual disabilities who resides at the Woodbridge Developmental Center in Woodbridge, NJ.  Maureen brings this lawsuit by and through her sisters and legal guardians, Kathleen DeCicco and Lori Centrella.  She has resided at WDC for approximately 12 years.

20.     KERR MITCHELL is a 42 year old male (d/o/b 5/22/1971) with a diagnosis of profound mental retardation who resides at the Woodbridge Developmental Center in Woodbridge, NJ.  Kerr brings this lawsuit by and through his mother and legal guardian, Juana Mitchell.  He has resided at WDC for approximately 25 years.

21.     EUGENE CARR is a 55 year old male (d/o/b  7/ 12/1957) with a brain injury diagnosis who resides at the Woodbridge Developmental Center in Woodbridge, NJ.  Eugene brings this lawsuit by and through his mother and legal guardian, Marylyn Carr.  He has resided at WDC for 43 years.

22.     LEAH WRIGHT is a 49 year old female (d/o/b 12/9/1964) with a diagnosis of profound mental retardation who resides at the Woodbridge Developmental Center in

Woodbridge, NJ.  Leah brings this lawsuit by and through her mother and legal guardian, Elizabeth Wright.  She has resided at WDC for approximately 27 years.

23.     CATHERINE O'BRIEN is a 52 year old female (d/o/b 3/28/1961) with a diagnosis of profound mental retardation who resides at the Woodbridge Developmental Center in Woodbridge, NJ.  Catherine brings this lawsuit by and through her parents and sister and legal guardians, Donald and Virginia O'Brien and Susan Mason.  She has resided at WDC for approximately 48 years.

24.     JACQUELINE FRIEDMAN is a 48 year old female (d/o/b 12/2/1964) with intellectual disabilities who resides at the North Jersey Developmental Center in Totowa, New Jersey.  Jacqueline brings this lawsuit by and through her brother and sister, legal guardians, Sam Friedman and Gail Friedman.  She has resided at NJDC for approximately 47 years.

25.     PAUL DITTAMO is a 46 year old male (d/o/b 2/20/1967) with a diagnosis of profound mental retardation who resides at the North Jersey Developmental Center in Totowa, New Jersey.  Paul brings this lawsuit by and through his mother and legal guardian, Wendy Dittamo.  He has resided at NJDC for approximately 44 years.

26.     CLAYTON DAVIS is a 56 year old male (d/o/b 2/10/1957) with intellectual disabilities who resides at the North Jersey Developmental Center in Totowa, New Jersey. Clayton brings this lawsuit by and through his sister and legal guardians, Rose Seyler and Dorothy Davis.  He has resided at NJDC for approximately 40 years.

27.     STEPHEN SCOTT DYER is a 45 year old male (d/o/b 7/2/1967) diagnosed with profound mental retardation who resides at the North Jersey Developmental Center in Totowa, New Jersey.  Stephen brings this lawsuit by and through his father and legal guardian, Peter Dyer.  Stephen has resided at NJDC for approximately 42 years.

28.     SUSAN GRIFFIN is a 59 year old female (d/o/b 9/15/1954) diagnosed with severe mental retardation who resides at the North Jersey Developmental Center in Totowa, New Jersey.  Susan brings this lawsuit by and through her sister and legal guardian, Barbara Columbo. She has resided at NJDC for approximately 20 years.

29.     EUGENE KESSLER is a 54 year old male (d/o/b 4/4/1959) with a diagnosis of moderate mental retardation, bipolar disorder, and pervasive developmental disabilities who resides at North Jersey Developmental Center in Totowa, New Jersey. Eugene brings this lawsuit by and through his mother and legal guardian, Frances Finkelstein.  He has resided at NJDC for approximately 6 years.

30.     PHILIP CONKLING is a 37 year old male (d/o/b 12/19/1976) with intellectual disabilities who resides at North Jersey Developmental Center in Totowa, New Jersey.   Philip brings this lawsuit by and through his mother and legal guardian, Caroline Conkling.  He has resided at NJDC for approximately 14 years.

31.     RALPH GRZYMKOWSKI is a 40 year old male (d/o/b 3/4/1973) with a diagnosis of autism who resides at the North Jersey Developmental center in Totowa, New Jersey.  Ralph brings this lawsuit by and through his parents and legal guardians, Dana and Mirek Grzymkowski.  He has resided at NJDC for approximately 12 years.

32.     MARY ELLEN SCESA is a 46 year old female (d/o/b 1/6/1967) with a diagnosis of severe mental retardation who resides at the North Jersey Developmental Center in Totowa, New Jersey.  Mary Ellen brings this lawsuit by and through her parents and legal guardians, Kathleen and Louis Scesa.  She has resided at NJDC for approximately 43 years

33.     ALICE TUCKER is a 58 year old female (d/o/b 2/1/1955) with intellectual disabilities who resides at North Jersey Developmental Center in Totowa, New Jersey.  Alice

brings this lawsuit by and through her sister and legal guardian, Bertha Westbrock.  She has resided at NJDC for approximately 29 years.

34.     STEPHANIE ROOTS is a 48 year old female (d/o/b 5/14/1965) with intellectual disabilities who resides at the North Jersey Developmental Center in Totowa, New Jersey. Stephanie brings this lawsuit by and through her mother and legal guardian, Marie Reid.  She has resided at NJDC for approximately 28 years.

35.     ANDREW SEKELA is a 41 year old male (d/o/b 12/7/1971) with intellectual disabilities who resides at the North Jersey Developmental Center in Totowa, New Jersey. Andrew brings this lawsuit by and through his mother and legal guardian, Winifred Sekela.

36.     KESHA SMITH is a 43 year old female (d/o/b 12/7/1970) with a diagnosis of profound mental retardation who resides at the North Jersey Developmental Center in Totowa, New Jersey.  Kesha brings this lawsuit by and through her mother and legal guardian Deborah Smith.  She has resided at NJDC for approximately 28 years.

37.     PAUL VACCA is a 51 year old male (d/o/b 1/15/1962) with a diagnosis of profound mental retardation who resides at the North Jersey Developmental Center in Totowa, New Jersey.  Paul brings this lawsuit by and through his parents and legal guardians, Donald and Theresa Vacca.  He has resided at NJDC for approximately 21 years.

38.     RALPH VERLEUR is a 50 year old male (d/o/b 5/22/1963) with a diagnosis of severe mental retardation who resides at North Jersey Developmental Center in Totowa, NJ. Ralph brings this lawsuit by and through his mother and legal guardian, Else Verleur.  He has resided at NJDC for approximately 24 years.

**DEFENDANTS**

39.     The Defendant, CHRISTOPHER CHRISTIE, is the Governor of the State of New Jersey.  Governor Christie is sued in his official capacity only.

40.     The Defendant, NEW JERSEY DEPARTMENT OF HUMAN SERVICES ("DHS"), is a public entity covered by Title II of the Americans with Disabilities Act 42 U.S.C. § 12131(1).  It receives federal funds under § 504 of the Rehabilitation Act, 29 U.S.C. § 794.  DHS administers services for more than one million of New Jersey's citizens, including individuals and families with low incomes; people with mental illnesses, developmental disabilities, or late-onset disabilities; people who are blind, visually impaired, deaf, hard of hearing, or deaf-blind; parents needing child care services, child support and healthcare for children; and families with catastrophic medical expenses for their children.  DHS is the largest agency in New Jersey.  DHS operates eight divisions including the Division of Developmental Disabilities.

41.     The Defendant, JENNIFER VELEZ, is the Commissioner of the New Jersey Department of Human Services ("DHS").  Ms. Velez is sued in her official capacity.  Defendant Velez is ultimately responsible for ensuring that New Jersey operates its delivery of services to individuals with disabilities in conformity with the United States Constitution, the ADA, the ADA implementing regulations, section 504 of the Rehabilitation Act of 1973 as amended, 29 U.S.C. § 794(a), and section 504's implementing regulations.

42.     The Defendant NEW JERSEY DEPARTMENT OF HUMAN SERVICES DIVISION OF DEVELOPMENTAL DISABILITIES ("DDD"), is a public entity covered by Title II of the Americans with Disabilities Act 42 U.S.C. § 12131(1).  It receives federal funds under § 504 of the Rehabilitation Act, 29 U.S.C. § 794.  DDD funds services and supports for eligible New Jersey residents with developmental disabilities.  The division was created in

response to the need for better and more effective services for state residents with developmental disabilities.

43.     The Defendant, DAWN APGAR, is Deputy Commissioner/Acting Assistant Commissioner of the New Jersey Department of Human Services Division of Developmental Disabilities.  Ms. Apgar is sued in her official capacity.  Defendant Apgar operates New Jersey's system of services to individuals with developmental disabilities and is ultimately responsible for ensuring that eligible New Jersey residents with developmental disabilities receive services and supports effectively and in accordance with the United States Constitution, the ADA, the ADA implementing regulations, section 504 of the Rehabilitation Act of 1973 as amended, 29 U.S.C. § 794(a), and section 504's implementing regulations.

44.     The Defendant, NORTH JERSEY DEVELOPMENTAL CENTER ("North Jersey" or "NJDC"), is a residential facility that provides, among other things, habilitation, behavioral, and medical services and supports for individuals with developmental and intellectual disabilities.  North Jersey opened in February 1928.  With its campus-like setting, it includes approximately thirty-five (35) buildings, including living areas, sheltered workshops, vocational building, school building, chapel, healthcare center, auditorium, and recreational facilities.  It is located in Totowa, Passaic County, New Jersey.  It is the northern most residential developmental center in New Jersey.  NJDC is a public entity covered by Title II of the Americans with Disabilities Act 42 U.S.C. § 12131(1).  It receives federal funds under § 504 of the Rehabilitation Act, 29 U.S.C. § 794.

45.     The Defendant, WOODBRIDGE DEVELOPMENTAL CENTER ("Woodbridge" or "WDC"), is a residential facility that provides, among other things, habilitation, behavioral, and medical services and supports for individuals with developmental and intellectual

disabilities.   Woodbridge was established in 1965. With its campus-like setting, it includes approximately twenty-five (25) buildings, including residential cottages, therapy rooms, healthcare services center, multi-purpose rooms, and recreational and entertainment facilities.  It is located in Woodbridge, Northern Middlesex County, New Jersey.  WDC is a public entity covered by Title II of the Americans with Disabilities Act 42 U.S.C. § 12131(1).  It receives federal funds under § 504 of the Rehabilitation Act, 29 U.S.C. § 794.

## CLASS ACTION ALLEGATIONS

46.    Pursuant to Fed. R. Civ. P. 23(a) and (b)(2), the named Plaintiffs bring this action on behalf of themselves and all other persons similarly situated.

47.    The Plaintiffs bring this action pursuant to the Civil Rights Act, 42 U.S.C. § 1983; the Americans with Disabilities Act, 42 USC § 12132; § 504 of the Rehabilitation Act, 29 U.S.C. § 794 ("Section 504"), and the waiver of state sovereign immunity enacted in 42 U.S.C. § 2000d-7(a)( 1), various Medicaid federal statutes, and regulations incorporated into New Jersey law and the United States Constitution, on behalf of a Class consisting of themselves and all other persons who are residents of the North Jersey Developmental Center and Woodbridge Developmental Center, Passaic and Northern Middlesex counties, respectively, New Jersey, as of August 1, 2012.

48.    The proposed class consists of:  New Jersey residents who reside or resided at the North Jersey or Woodbridge Developmental Centers, at anytime since August 1, 2012, or at any time during this litigation.

49.     Joinder of the entire Class is impracticable because the Class Members are numerous, and are persons with severe or profound developmental disabilities.  Virtually all Class Members are unable to give their consent except through guardians or family members.

50.     The Plaintiffs' claims are typical of the claims asserted on behalf of the Class.

51.     The Plaintiffs do not have any interests that are adverse or antagonistic to any claims or potential claims of the Class.

52.     The Plaintiffs will fairly and adequately protect the interests of the members of the Class.

53.     The Plaintiffs are committed to the vigorous prosecution of this action and have retained counsel competent and experienced in this type of litigation.

54.     The Plaintiffs do not seek monetary damages.  Hence, the burden and expense of prosecuting this litigation makes it unlikely that members of the Class would or could prosecute individual actions.  If individual actions were pursued by Class Members, prosecution of those individual claims would be impracticable and inefficient.

55.     This Court is the most appropriate forum for adjudicating the claims at issue, which arise under federal law.

56.     The Plaintiffs do not anticipate any difficulty in the management of this action as a class action.

57.     There are many questions of law and fact common to the Class, which predominate over any questions which may affect individual members.  The predominant common questions of law and fact include, among others:

                (a)  Whether Defendants are liable for violation of the Civil Rights Act, 42 U.S.C. § 1983;

16

(b)  Whether Defendants are liable for violation of the Americans with

Disabilities Act, 42 U.S.C. § 12132;

(c)  Whether Defendants are liable for violation of § 504 of the Rehabilitation

Act, 29 U.S.C. § 794 ("Section 504");

(d)  Whether Defendants are liable for violation of various Medicaid federal

statutes and regulations incorporated into New Jersey law;

(e)  Whether Defendants are liable for violations of the United States

Constitution; and

(f)  Whether named Plaintiffs and Class Members are entitled to equitable and

injunctive relief.

58.     A class action is superior to all other available methods for the fair and efficient

adjudication of this controversy.

59.     Plaintiffs seek declaratory and injunctive relief, attorneys' fees and expenses as

permitted by law, on behalf of themselves and the Class.

## COMMON FACTUAL ALLEGATIONS.

60.     All of the Plaintiffs reside at the North Jersey or Woodbridge Developmental

Centers or resided there as of August 1, 2012.

61.     Almost all of the Plaintiffs have lived in their homes at NJDC and WDC for many

years, with approximately 80 percent of those residents having lived there for more than 20

years.  Many of these individuals have resided at the Developmental Centers for over 40 years.

62.     The North Jersey Developmental Center is an Intermediate Care Facility for Individuals with Intellectual Disabilities ("ICF/IDD") that is operated by the State of New Jersey.

63.     The Woodbridge Developmental Center is an Intermediate Care Facility for Individuals with Intellectual Disabilities ("ICF/IDD") that is operated by the State of New Jersey.

64.     An Intermediate Care Facility for Individuals with Intellectual Disabilities("ICF/IID") (formerly referred to as an Intermediate Care Facility for the Mentally Retarded or "ICF/MR") is regulated by the Centers for Medicare and Medicaid Services ("CMS") in conjunction with the State's licensing agency.  Part of that regulatory process includes routine surveys by CMS and the State's licensing agency to ensure quality treatment and services are provided by ICF/IID-certified facilities, like North Jersey or Woodbridge Developmental Centers**.**

65.     Eligibility for residence in a New Jersey developmental center is defined by Section 1.3 of Division Circular #3, N.J.A.C. 10:46-1.3, effective March 24, 2011.  That regulation defines the developmental disability that must be present in order to receive services as a severe, chronic disability of an individual, which is attributable to a mental impairment, physical impairment, or combination of both; is manifested before age 22; is likely to continue indefinitely; results in a combination of functional limitations in major life activities; reflects the need for a combination of special interdisciplinary care or treatment of lifelong or extended duration; and includes, but is not limited to, developmental disabilities, autism, cerebral palsy, epilepsy, spina bifida, and other neurological impairments.

66.     All of the Plaintiffs are diagnosed as in need of state-run ICF/IID institutional care and have been appropriately designated as eligible for state-operated ICF/IID-level of care.

67.     Many of the individuals residing at the North Jersey Developmental Center have been diagnosed with profound or severe intellectual disabilities. Almost all individuals residing at NJDC have been diagnosed with additional disabilities, including seizure disorders, autism, cerebral palsy, vision difficulties, and hearing impairments.  For example:

(a) The Plaintiff, Jacqueline Friedman, is profoundly cognitively disabled.  She is non-verbal and requires constant care.

(b) The Plaintiff, Paul Dittamo, cannot walk, is non-verbal and experiences daily seizures.  His medical care requires constant communication between professionals.

(c) The Plaintiff, Stephen Dyer, is non-verbal and is diagnosed with microcephaly, spastic cerebral palsy, seizure disorder, bilateral contractures, bilateral chronic hip dislocation, delayed swallowing reflex, small hiatal hernia, osteoporosis, and esophogitis.

(d)  The Plaintiff, Susan Griffin, is diagnosed with severe mental retardation, bipolar disorder, schizophrenia, and atrophy of the brain. She requires constant care and medical coordination between professionals.

(e) The Plaintiff, Eugene Kessler, is diagnosed with moderate retardation and pervasive developmental disabilities, he suffers from autism, bipolar disorder, and lacks judgment. He often becomes agitated and prone to harm himself, or others.

(f)  The Plaintiff, Philip Conkling, is autistic and suffers from cognitive

disabilities.  Philip thrives on structure and routine.

(g) The Plaintiff, Ralph Grzymkowski, is diagnosed with autism.  He exhibits

severe behaviors and is very combative.  He requires constant supervision.

(h) The Plaintiff, Mary Ellen Scesa, is diagnosed with severe mental retardation

and Dyke-Davidoff Syndrome, she is non-ambulatory and non-verbal.  She

suffers from seizures as well.  She requires constant care.

(i)  The Plaintiff, Alice Tucker, is diagnosed with seizure disorder, schizophrenia,

cerebral palsy, depression, malignant breast cancer, high blood pressure, and

gout.  She is extremely combative and aggressive. She is bi-polar and

experiences multiple personalities.

(j)  The Plaintiff, Stephanie Roots, suffers from seizures.  She had a tumor in her

pelvis and now requires a leg brace to ambulate.

(k)  The Plaintiff, Andrew Sekela, is prone to elopement when a situation arises

that he perceives as unfair or when he becomes overwhelmed.  He has

multiple seizure disorder brought on by multiple brain scarring from

meningitis suffered at age two.  Andrew requires constant supervision.

(l)  The Plaintiff, Kesha Smith, is epileptic and suffers from petit mal seizures.

She has limited speech and is prone to wandering and aggressive behavior.

She requires much supervision.

(m) The Plaintiff, Paul Vacca, has cerebral palsy, he is non-verbal and walks with

a difficult gait.  He experiences frequent falls and engages in self-injurious

behavior, banging his head when frustrated.

(n)  The Plaintiff, Ralph Verleur, has cerebral palsy, is blind in one eye, is

incontinent, and is not ambulatory.  He relies on staff for total care including

blowing his nose.  He suffers from echolalia.  He takes constipation and anti-

convulsant medication.

68.     Most (approximately 97%) of the individuals residing at the Woodbridge

Developmental Center have been diagnosed with profound or severe intellectual disabilities.

Almost all individuals residing at WDC have been diagnosed with additional disabilities,

including seizure disorders, autism, cerebral palsy, vision difficulties, and hearing impairments.

For example:

(a)  The Plaintiff, Rosemary Sciarrillo, suffers from severe scoliosis, dysphagia,

severe constipation, severe osteoporosis (with high fracture risk), and a

seizure disorder.  She is unable to communicate and needs to be re-positioned

every couple hours.  Rosemary is totally dependent upon staff to initiate and

complete all activities of daily living.

(b)  The Plaintiff, Joyce Banos, suffers from major depressive disorder, seizure

disorder, cerebral palsy, moderate dyshagia, constipation, thoracolumbar

kyphoscoliosis, myopic astigmatism, osteopenia, chronic esophagitis, and

gastritis.  Joyce is non-verbal.  Her routine medications include Citrical,

Vitamin D, Zantac, Lamictal, Colace, and Lexapro.

(c)  The Plaintiff, Robert Barrett, is non-verbal.  He is blind in one eye and has

scoliosis.  He requires 1:1 supervision to prevent self-injury and wears a

helmet and face mask to protect himself from his own slaps and from falls.

(d) The Plaintiff, Charles David Christensen, is diagnosed with epilepsy and autism.  He requires constant care and 15 minute checks for safety and protection.

(e) The Plaintiff, Arleen Brause, suffers from severe emotional and behavioral problems.  She has many fears and phobias and is easily agitated.  She is diagnosed with cerebral palsy and autism.

(f) The Plaintiff, Kenneth Cooper, has cerebral palsy and is blind.

(g) The Plaintiff, Vincent Galluccio, is non-verbal, suffers from a major motor seizure disorder, and requires constant care.

(h) The Plaintiff, Rodney Hammond, suffers from severe chronic cerebral palsy. He is non-verbal and cannot walk.  He requires constant care.

(i) The Plaintiff, Sharon Knapp, has osteoporosis and is at risk of falls.  She has a 1:1 aide.

(j) The Plaintiff, Richard Sarao, has cerebral palsy and is prone to self-abusive behavior.  He requires constant care and supervision.

(k) The Plaintiff, Cheryl Gordon, experiences severe behavioral issues.  She suffers from a brain injury acquired at birth. Cheryl requires constant supervision.

(l) The Plaintiff, Peter Canale, is blind and deaf, and has intellectual disabilities. Weighing 60 pounds, he is very frail.  He is on a feeding tube and recognizes people by smell and touch. He is diagnosed with hydrocephalus and spina bifida.

(m) The Plaintiff, Linda Graves, experiences seizures.  At times, she is seen by physicians on 15 minute interval checks.

(n) The Plaintiff, Dianne O'Brien, is diagnosed with profound retardation.  She is non-ambulatory and non-verbal.  She has osteoporosis and experiences seizures.  She wears a nerve monitor around her vagal nerve.

(o)  The Plaintiff, Thomas Marinello, requires constant care and close supervision.  Thomas has a curvature of the spine and cannot sit up on his own or stand.  He cannot talk and suffers from a palate defect.

(p)  The Plaintiff, Maureen Doran, is prone to wander and exhibits violent behavior.  She experiences extreme anxiety.  She has pervasive developmental disability.

(q)  The Plaintiff, Kerr Mitchell, is mentally and physically disabled.  He suffers from seizures and brain injury. He has diagnoses of profound mental retardation, cerebral palsy, and moderate spastic quadriplegia.

(r) The Plaintiff, Eugene Carr, has a diagnosis of hydrocephalus. He exhibits aggressive behavior and requires constant care.

(s) The Plaintiff, Leah Wright, is dependent on a wheelchair and her range of motion is limited to sitting up and rolling back and forth.  She often refuses to eat.  She has a diagnosis of profound mental retardation.

(t)  The Plaintiff, Catherine O'Brien, is non-verbal and non-ambulatory.  She is diagnosed with microcephaly and profound mental retardation. She suffers from seizures, regurgitation, chronic constipation, chronic otis media, and osteoporosis.  For safety, she requires 15 minute checks.  She also relies on

total care from staff (including being pushed in her wheelchair, hand over hand assistance for all activities, bathing, dressing, being hand fed, and repositioning.) Her medications include Lamictal, Keppra, Phenobarbitol, Colace, Milk of Magnesia, Senalcot, Fleet Enema, Ducolax, Reglan, Zantac, Actonel, Oscal D, Tylenol and Unicap.  Catherine routinely sees an othalmologist, gynecologist, GI consultant, ENT audiologist, dentist, podiatrist, and neurologist.

69.     The primary service needs of individuals at North Jersey or Woodbridge Developmental Centers require a variety of services and supports. Some broad areas of service are described below, along with the number of individuals for whom that service is their primary need:

(a)  Extensive Personal Care - This need refers to people who require total assistance and care provided by direct service staff who are specially trained on individualized programs developed by residents' treating professionals, including physicians, nurses, physical therapists, occupational therapists, speech language pathologists, and many other licensed clinicians who treat residents at the Centers.

(b)  Significant Health Care Services - Treating professionals at NJDC and WDC have determined that significant nursing intervention and monitoring are required to effectively treat residents who have significant health care needs. This service includes the need for 24-hour monitoring and immediate availability of treating professionals for intermittent pressure breathing,

inhalation assistive devices, tracheotomy care, or treatment for recurrent pneumonias or apnea.

(c) Ambulation – Many residents at NJDC and WDC are non-ambulatory or require assistance with ambulation.

(d) Significant Behavioral Support – Many residents at NJDC and WDC require significant behavioral support. This need addresses individuals who have behaviors that require intervention for the safety of themselves or others, as developed by psychologists and medical personnel and implemented in conjunction with direct service staff.

70.     Prior to 2012, all NJDC and WDC residents were consistently evaluated by their treating professionals and determined to be in need of ICF/IID services, and the best setting for Plaintiffs to receive those services was at NJDC or WDC as determined by the professional judgment of these professionals.  Subsequent to Defendants' announcement of its intent to close the NJDC and WDC, treating professionals often have routinely and inappropriately stated that Plaintiffs would best be served in alternative settings, including settings that do not provide ICF/IID-level of care.  Most of these statements supporting placement in the "community" were not based upon sound and unbiased professional judgments consistent with accepted professional standards.

71.     While many residents' IHP teams have agreed that the residents' needs were better served at their current ICF/IID, social workers have more recently been sending letters, scheduling IHP meetings promoting community placements.  Such letters are DDD-generated, bureaucratic, form letters.  For example, the 1/14/13 letter to Eleanor Gordon, scheduling her daughter's, Cheryl's, IHP meeting uses the name "Dawn" instead of Cheryl, throughout.  While

Daniel Christensen's 2/13/13 letter used the correct residents' name, David, it stated the same exact non-subtle push for community placements.

72.     Community placements are being sought for residents regardless of their needs. For example, a State caseworker considered community placement to be inappropriate for Eugene Kessler, yet, nonetheless is pursuing an alternative community placement, an apartment, for him.

73.     Plaintiffs have the right to receive ICF/IID-level of services from the State of New Jersey.

74.     All Plaintiffs have had or imminently will have their rights to receive ICF/IID-level services at the North Jersey or Woodbridge Developmental Centers denied.  The policies and practices of the State will deceive, frighten, and coerce residents of NJDC and WDC into inappropriately surrendering their rights to receive this superior level of care.

> (a)  The Plaintiff, Diane O'Brien, has not had an appropriate assessment by her interdisciplinary team for a lesser restrictive residential environment, yet, her plan describes her as being appropriate for community placement.  Her father and legal guardian opposes a community placement for Diane at this time due to her health issues.  She experiences seizures; wears a heart monitor and applies a magnet; and wears a nerve monitor.

> (b)  The Plaintiff, Thomas Marinello, has resided at WDC since childhood and is happy and thriving.  His mother and sister, his legal guardians, feel pressured and manipulated by the State to move Thomas into a community setting, being told that if they did not move him the State would be forced to place

him in a location further away.  Incomplete information has been provided to them regarding any possible discharge.

(c) The sisters and legal guardians of Plaintiff, Maureen Doran, were advised by the State that if they did not make an immediate decision regarding alternative community placement for Maureen, the State would make the decision for them.  Maureen was not offered an alternative developmental center.

(d) The brother and guardian of the Plaintiff, Joyce Banos, was lectured at every IHP meeting about considering community placement.  Mr. Banos' wishes that his sister remain in ICF/IID care were not respected until he wrote a letter expressing his opposition to community placement for Joyce and explaining her need to stay at WDC.  Mr. Banos sits with a team of 15 professionals at Joyce's yearly IHP meeting; these specific skilled professionals are required to keep Joyce alive and healthy.

(e) A guardian and mother, Dana Grzymkowski, receives frequent telephone calls from state employees pressuring her and her husband to choose a community placement for her son, Ralph.

(f) Although Plaintiff, Vincent Galluccio, is non-verbal, his plan indicates that he would like to move to a community placement, despite his guardian's wishes. Staff have been non-specific about the availability of required supports for Vincent in the community.

75.     Many NJDC and WDC residents have lived in the community at some time.  Such placements have proven to be unsuccessful.

(a)  The Plaintiff, Arleen Brause, spent several months in a group home.  She was lonely, insecure, and constantly upset.  No activities or on-site medical care were available to her.

(b)  The Plaintiff, Cheryl Gordon, tried placements at various group homes.  She was asked to leave the homes due to her behavioral issues, which the homes were not equipped to manage.

(c)  The Plaintiff, Philip Conkling, experienced a group home, but the lack of supervision for his wandering necessitated return to a facility which could better serve his health and welfare.

(d)  The Plaintiff, Clayton Davis, tried an alternative community placement three years ago.  The placement could not adequately address his emotional and psychological needs.  He was needlessly medicated at the home in their effort to care for him.

(e)  The Plaintiff, Susan Griffin, experienced a group home which her guardian described as "total chaos."  Susan was released to a psychiatric hospital and, once stabilized, moved to NJDC where she has been thriving.

(f)  The Plaintiff, Kesha Smith, tried a group home but was asked to leave the home due to her aggression.  While she was at the home she would get on the bus and ride around the city for as long as the drivers would allow.

(g)  The Plaintiff, Alice Tucker, has experienced group homes where she was physically abused and underfed.  In group home proposals, it has been suggested that staff call 911 to manage Alice's aggressive episodes.

76.     There has been, and there is a continuing further risk of, a loss of professionals and other staff at North Jersey and Woodbridge Developmental Centers due to a perceived lack of job security.  Such losses have and will result in larger caseloads for existing staff, and thus less time and care for each resident.  For example at WDC, Cottage 1 Social Worker, (Doris Dodkowitz), retired and was replaced by a Social Worker, (Norma Bonilla), who is now responsible for 3 cottages instead of two.  Also, the Habilitation Coordinator, Kim Shackleton transferred from WDC in April 2013, and her vacant position has not yet been filled.

77.     There has been, and there continues to be a further risk of, a loss of some services at North Jersey or Woodbridge Developmental Centers due to downsizing and eventual closure. This has and will result in inferior care in violation of Plaintiffs' rights and will ultimately inappropriately force residents to leave North Jersey or Woodbridge Developmental Centers. For example, there has already been a decrease in the availability of certain medications, supplies, and skin care products.

78.     As NJDC cottages close, in some building units, such as at resident Andrew Sekela's unit, inexperienced and over-worked staff have replaced experienced staff, resulting in confusion with respect to resident care.

79.     As NJDC cottages close, resident housing is being merged, creating a dangerous and chaotic environment.  Andrew Sekela's mother has been physically harmed by another resident when visiting Andrew and is aware of various resident-to-resident and resident-to-staff assaults due to the revised living arrangements.

80.     The Defendants have acted, or failed to properly act, under the color of state law, pursuant to the protections of the Fourteenth Amendment to the Constitution of the United States.

81.     The Defendants have determined that the residents of WDC and NJDC have developmental disabilities and require treatment, services, supports, and care.

82.     The Defendants have, since the decision to close the developmental centers, increasingly failed to provide the WDC and NJDC residents with reasonably safe conditions in their delivery of treatment, service, supports, and care.

83.     One example of recent inadequate staffing and lack of protection from harm occurred to Maureen Doran.  Maureen was sleeping when a resident came upon her and started beating her with a metal chair.  The supervisor was at the other end of the cottage.  The beating went on for some significant time because they were unattended. There was inadequate direct care staff.  The next morning, her guardian was notified that Maureen was taken to the hospital as a precautionary measure due to a nosebleed. The guardian did not find out that there was an attack until much later.  Previous to this attack, there were two separate incidents where Maureen suffered a fractured foot and a head injury with a bleed due to poor staffing.  However, Maureen remained inadequately supervised at the time of the attack.

84.     The Defendants' treatment, services, supports, and care, since the decision to close the developmental centers, have in some instances substantially departed from generally accepted professional standards of care.

85.     The Defendants' provision of psychological and behavioral services, since the decision to close the developmental centers, have in some instances substantially departed from generally accepted professional standards.

86.     The Defendants' provision of medical, neurological, and nursing services, since the decision to close the developmental centers, have in some instances substantially departed from generally accepted professional standards.

30

87.     The Defendants' provision of psychiatric services, since the decision to close the developmental centers, have in some instances substantially departed from generally accepted professional standards.

88.     The Defendants' provision of habilitation and therapy services, including physical and nutritional management, since the decision to close the developmental centers, has in some instances substantially departed from generally accepted professional standards.

89.     The Defendants' provision of protection from harm mechanisms, since the decision to close the developmental centers, has in soome instances substantially departed from generally accepted professional standards.

90.     Due to some instances of lack of appropriate treatment, services, supports, and care, since the decision to close the developmental centers, the residents are at significant risk of harm, or have suffered actual harm.

91.     The Defendants have failed in some instances to provide the WDC and NJDC residents, since the decision to close the developmental centers, with the appropriate level of habilitation training and behavioral training required to protect the residents' liberty interests to protect them from harm and the freedom of undue restraints.

92.     The Defendants seek to compel Plaintiffs' discharge from North Jersey or Woodbridge Developmental Centers to other settings, including predominately non-ICF/IID-certified settings.

93.     The Defendants' policies and procedures have interfered with or usurped the ability of Plaintiffs' treating professionals to make independent and sound professional judgments.  The treating professionals are now often following a political or administrative agenda rather than accepted professional standards.

94.     The Defendants' policies and procedures have unduly influenced or compelled Plaintiffs' treating professionals to recommend transfer or discharge of Plaintiffs to settings that are not the most appropriate for Plaintiffs' needs, solely for the purpose of conforming to Defendants' political policy decisions.

95.     In some cases, staff exaggerates the residents' personal care abilities in order to document the appropriateness of a community placement.  For example:

(a)  Staff  report that resident Paul Dittamo is able to feed himself.  However, staff must place food on a spoon for Paul and assist him in bringing it to his mouth; and only a portion of the food makes it into his mouth.  If Paul were left to feed himself, he would be underfed.

(b)  Staff  report that resident Peter Canale is able to brush his teeth.  However, staff put the toothbrush in his hand and assist him in performing this function. He is unable to brush his teeth on his own.

(c)  Staff uses language in the first person in residents' IHPs, creating a false perception of resident choice and a false impression that residents are less intellectually disabled.

96.     All Plaintiffs are medically and developmentally most appropriately served at the North Jersey or Woodbridge Developmental Centers instead of any alternative setting.

97.     All Plaintiffs are physically, mentally, and emotionally fragile and are most appropriately served at the North Jersey or Woodbridge Developmental Centers instead of any alternative setting.

98.     All Plaintiffs are in need of continuous care by multidisciplinary teams of professionals as are currently serving them at the North Jersey or Woodbridge Developmental Centers.

99.     The services provided to Plaintiffs cannot be reasonably replicated in alternative residential settings.

100.    Non-ICF/IID-certified settings are not able to reasonably provide the same level of care as an ICF/IID-certified facility.

101.    Services provided to residents at the North Jersey or Woodbridge Developmental Centers are uniquely tailored to the needs of the residents of those Centers.

102.    None of the Plaintiffs have given informed consent for their discharge from North Jersey or Woodbridge Developmental Centers because, among other things, Defendants have precluded treating professionals at the North Jersey or Woodbridge Developmental Centers from fully and fairly considering whether North Jersey or Woodbridge Developmental Centers best meet the needs of the Plaintiffs, and have prevented those treating professionals from acknowledging the rights of Plaintiffs to receive treatment and services at North Jersey or Woodbridge Developmental Centers, or in another ICF/IID.

103.    Alternative ICFs/IID, if available, are many miles away, and deny guardians, parents, and family members the opportunity to visit on a regular basis.  Many guardians, parents, and family members are elderly and cannot make a long distance trip to visit a distant ICF/IID.  Such lack of family bonding may cause further harm to the well-being of those being moved and disrupts the family ties.   Family members and guardians contribute positively to the care, treatment, habilitation, and psychological well-being of residents, and residents will suffer great harm if their loved ones cannot participate.

104.    Plaintiffs have not had the benefit of their respective treating professionals' independent judgments about whether they should continue to reside at North Jersey or Woodbridge Developmental Centers or at another state-operated ICF/IID.

105.    Defendants have or will unduly influence or compel Plaintiffs to receive services in non-ICF/IID facilities.  Those services are inferior to the services provided at North Jersey or Woodbridge Developmental Centers because, among other reasons, they will not be provided by an individualized, multidisciplinary team of professionals.

106.    Some Plaintiffs will be unable to even receive services in the community.  For example, Ralph Verleur has been rejected for admissions to three group homes.  One home would not take him because it was too small for him to maneuver his wheelchair.  Another group home declared him an inappropriate candidate due to his echolalia.

107.    Persons residing in the type of settings to which Defendants intend to discharge Plaintiffs, are at approximately seventy-five (75) percent greater risk of death, abuse, and neglect as compared to similar persons receiving services at a facility like North Jersey or Woodbridge Developmental Centers.

108.    Defendants know or should know of the increased danger of death, abuse, and neglect to which Plaintiffs will be subjected if they are discharged from the North Jersey or Woodbridge Developmental Centers, as sought by Defendants' political plan to downsize or close all the Developmental Centers.

109.    Persons residing in the type of "community" settings to which Defendants intend to discharge Plaintiffs are likely to be more secluded from the community immediately surrounding them and be more restricted in their interactions with non-disabled peers as

compared to similar persons receiving services at a facility like North Jersey or Woodbridge Developmental Centers.

110.    Defendants have announced their plan to "depopulate" and close NJDC and WDC and discharge residents to non-ICF-IID-certified alternative settings.  The plan is to move the residents to "community" settings such as small group homes, nursing homes, and other settings with smaller populations where they would allegedly have more interactions with the non-disabled population.  In reality, these residents may actually be more isolated in a small home or apartment than they were at NJDC and WDC, as both centers are open to community events and have opportunities for community involvement.

111.    Among the reasons identified by Defendants for their "depopulation" plan was the ostensibly high cost of providing the necessary services for the disabled residents of the State's developmental centers.  In reality, the costs for caring for these residents in community settings would be equal to or higher than care in the developmental centers.

112.    Contrary to Defendants' public statements about the alleged general desire for "community" placements, Plaintiffs have not requested discharge or transition from North Jersey or Woodbridge Developmental Centers.

113.    Defendants have instructed or inappropriately encouraged Plaintiffs' treating professionals to include language in Plaintiffs' individual habilitation plans indicating that Plaintiffs are capable of being served in settings other than North Jersey or Woodbridge Developmental Centers regardless of whether Plaintiffs are actually capable of being served in alternative settings.

114.    Defendants have instructed or inappropriately encouraged Plaintiffs' treating professionals to include language in Plaintiffs' individual habilitation plans indicating that

Plaintiffs have requested discharge to settings other than North Jersey or Woodbridge Developmental Centers regardless of whether Plaintiffs actually communicated such a request.

115.    These treating professionals are likely intimidated and fearful of retaliation, including the possible loss of their jobs, and likely will only be forthcoming with information to support the position of Plaintiffs if protected by or compelled by appropriate discovery in this case.

116.    Because Plaintiffs' treating professionals have not been able to provide independent judgments about the Plaintiffs' ability to be comparatively served in alternative settings, the judgments they have made in that regard are largely unreliable and inaccurate.

117.    Many of the Plaintiffs have not been provided sufficient information to allow them to provide informed consent to discharge.

118.    Plaintiffs' guardians and family members have been given unclear and conflicting information as to the availability of specific alternative placements. In some cases, since information has not been forthcoming by the State, parents are left to believe speculation of options from other parents.

(a)  The guardians/family members of Maureen Doran and Eugene Carr, for example, felt pressured as they were told by their caseworkers that the longer they wait to choose a placement, the less choice they will have and that if they did not make a choice, the state would make it for them..  No specific alternative placements to "choose" from were offered.

(b)  Some residents' family members, such as Kerr Mitchell's mother, were falsely told that if a parent refuses a staff's choice of placement or declined placement, their loved one would be sent home.

(c) The guardians of Ralph Grzymkowski continuously receive unwelcome correspondence from different agencies, the purpose of which is to move Ralph to a community setting.  The guardians believe that the NJDC placement is a much better fit for their son.

(d) Residents have only been given two insufficient choices: a non-specific community placement or an alternative developmental center over one hundred miles away.

(e) Information provided to guardians and family members by the State has been one-sided, promoting the only the alleged benefits of community placement.  The State has not made sufficient effort to address the potential risks of community placement and has not sufficiently attempted to lessen guardians'/family members' fears and concerns.

(f) In some cases, such as that of Plaintiff Andrew Sekela, NJDC personnel discussed his transfer to a group home with Andrew without the consent or participation of his guardian.  NJDC allowed group home providers to interview Andrew without the notification, participation or consent of Andrew's guardian or members of his NJDC staff.  Talk of the move upset him.  He understood the move as imminent release and has acted out by eloping.

(g) The Plaintiff, Stephen Dyer, requires extensive medical and therapeutic care to prevent further regression.  He requires round-the-clock nursing care for his medical needs.  Yet, the State inappropriately considers him an "adequate candidate" for a, non-specific, community placement.  His guardians and

parents feel pressured by the State to consider community placement and they

are often solicited from various inadequate group homes.

119.     Defendants made the decision to downsize or depopulate the North Jersey or

Woodbridge Developmental Centers without regard to the needs of the individual Plaintiffs, their

individual support plans (which are developed in conjunction with their treating professionals),

or their rights to receive services in the least restrictive setting appropriate to their needs.

120.     On December 14, 2011, the New Jersey Legislature enacted a statute which

included the creation of a task force to evaluate the state's seven developmental centers and to

issue binding and non-binding recommendations to the Department of Human Services ("DHS")

with respect to closure of one or more of the centers.  Senate No. 2928, Chapter 143 P.L. 2011.

121.     On August 1, 2012, the "Task Force on the Closure of State Developmental

Centers" ("task force") issued a "Final Report As Submitted to Governor Chris Christie and the

New Jersey Legislature" ("Final Report").

122.     The Task Force's allegedly binding recommendation as contained in the Final

Report instructed DHS "to develop and implement a plan to close North Jersey Developmental

Center followed by Woodbridge Developmental Center within the next five years …." Id. at 8.

123.     While the Final Report contains language allegedly regarding the needs of the

residents, such language is largely rendered meaningless by the Task Force's presumption that

the two facilities must be closed, and that residents must be discharged to achieve its binding

recommendation and to achieve the political agenda of the State.

124.     The Task Force's recommendations and the State's actions to discharge residents

to comply with the recommendations of closure prevent meaningful evaluation and consideration

of treatment team professionals regarding most integrated residential settings and alternative settings which can serve the needs of such residents.

125.    The Task Force's decision to close NJDC and WDC was largely predetermined before conducting any investigations or making any findings.

126.    In rendering it's opinions and recommendations, the Task Force ignored testimony and information regarding the large percentages of those at NJDC and WDC who are opposed to community placement; the level of impairment of the NJDC and WDC residents (compared to those in other developmental centers); and the availability of appropriate and adequate alternative placements to match the current level of services provided to NJDC and WDC residents.

127.    The Task Force rendered opinions and recommendations based on faulty data, including inaccurate unemployment data in the various New Jersey regions; inaccurate projected repair and maintenance costs of NJDC and WDC; and the lack of feasibility of a workable plan to meet the needs of all affected individuals within a five year timeframe.

128.    Residents of the State's developmental centers, those recommended for closure and those not recommended for closure, have the right to receive recommendations from their respective treating professionals regarding the most appropriate setting to meet the needs of such residents.

129.    The Task Force's mandate to close two developmental centers without meaningful evaluation of the residents' needs further evidences that the residents of the developmental centers have not received treating professionals' recommendations without unreasonable interference or influence from the State's policies, procedures and agendas.

130.    Plaintiffs currently residing at North Jersey and Woodbridge Developmental Centers have been and will be denied access to their current high level of treatment and services if the Defendants continue with their current plan to discharge residents.

## COMMON ALLEGATIONS OF RIGHTS AND DUTIES

131.    As described more fully herein, each Plaintiff has a constitutional right, a life and liberty interest in, and a statutory entitlement to receive treatment and services from the State of New Jersey in the most appropriate setting for his or her needs.

132.    Interpreting the ADA and the Department of Justice's regulations issued under it, the Supreme Court decision in Olmstead emphasized that there is no "federal requirement that community-based treatment be imposed on patients who do not desire it." Olmstead v. Zimring, et al., 527 U.S. 581, 602 (1999).  The Olmstead Court further stressed that "nothing in the ADA or its implementing regulations condones termination of institutional settings for persons unable to handle or benefit from community settings." Id. at 601-02. "[T]he ADA is not reasonably read to impel States to phase out institutions, placing patients in need of close care at risk." Id. at 605.

133.    In fact, the Olmstead decision recognized that "for [some] individuals, no placement outside the institution may ever be appropriate." Id. (citing and quoting Brief for American Psychiatric Association et al. as *Amici Curiae* at 22-23 ("Some individuals, whether mentally retarded or mentally ill, are not prepared at particular times—perhaps in the short run, perhaps in the long run—for the risks and exposure of the less protective environment of community settings"); Brief for Voice of the Retarded et al. as *Amici Curiae* at 11 ("Each disabled person is entitled to treatment in the most integrated setting possible for that person— recognizing that, on a case-by-case basis, that setting may be in an institution"); Youngberg v.

Romeo, 457 U.S. 307, 327 (1982) (Blackmun, J., concurring) ("For many mentally retarded people, the difference between the capacity to do things for themselves within an institution and total dependence on the institution for all of their needs is as much liberty as they ever will know").)

134.     By virtue of the ADA and the Olmstead decision, Plaintiffs have a federally-protected right to receive recommendations from treating professionals as to whether community placement is the most appropriate to meet their needs and to fair consideration of their opposition to that transfer, even if the proposed transfer is from institutional care to an allegedly less restrictive setting.  The only proper mechanism for second-guessing an individual or guardian's decision to oppose a treating professional's recommended transfer to a less restrictive setting is through State law and State Court Rules. See N.J. Stat. Ann. §§ 3B:12-1 et seq.; N.J. Court Rule 4:86.

135.     The paradigm created by the Olmstead decision dictates that residents of the North Jersey and Woodbridge Developmental Centers and their guardians have the benefit of treating professionals' judgments regarding the most appropriate place to receive services.  Only after they have the benefit of that information are residents and guardians required to oppose or consent to continued residence at the facility or discharge to an alternative setting.

136.     The Defendants have ignored and will continue to ignore Plaintiffs' right to have treating professionals render full and fair judgments as to where Plaintiffs' should receive services most appropriate to their needs.

137.     Likewise, Defendants have ignored and will continue to ignore Plaintiffs' rights, as recognized by Olmstead, to oppose discharge from NJDC and WDC.

138.    Pursuant to 42 U.S.C. § 12134, Defendants are under a constitutional and statutory duty to:

(a)  effectuate the placement of Plaintiffs in the "most integrated setting appropriate to the needs of qualified individuals with disabilities," a setting that "enables individuals with disabilities to interact with nondisabled persons to the fullest extent possible" (28 C.F.R. pt. 35 app. A.);

(b)  not place Plaintiffs in more restrictive or dangerous placements than they currently enjoy;

(c)  effectuate appropriate institutional placement for each Plaintiff;

(d)  propose an ICF/IID-certified institutional discharge appropriate for the Plaintiffs only where medically and therapeutically appropriate upon an impartial multidisciplinary evaluation;

(e)  ensure that Plaintiffs, Plaintiffs' guardians and/or Plaintiffs' families understand their right to receive treatment and care at an ICF/IID-certified facility prior to seeking consent to discharge a Plaintiff from the Center;

(f)  obtain the input and informed consent of Plaintiffs, Plaintiffs' guardians and/or Plaintiffs' families for such transfers.

**FIRST CAUSE OF ACTION**

**AMERICANS WITH DISABILITIES ACT VIOLATIONS**

139.    Plaintiffs' incorporate paragraphs one (1) through one hundred thirty-eight (138) herein by reference as though fully set forth.

140.     Because discharges or transfers are being forced on Plaintiffs without their consent, or the consent of their guardians or families, and without appropriate recommendations from treating professionals, such discharges or transfers violate the Americans with Disabilities Act, 42 U.S.C. §§ 12131 – 12134.

141.     The Plaintiffs are entitled to injunctive and declaratory relief that the Defendants shall not discharge or transfer them from their current residences without meeting the requirements that:

(a) such discharge or transfer will not result in Plaintiffs receiving treatment and services in a setting more restrictive of their rights than their current residence;

(b) such discharge or transfer will not be recommended by treating professionals unless the treating professionals independently conclude that such a placement is in the best interests of each Plaintiff and is the most appropriate setting to meet their needs; and

(c) the Plaintiffs by their guardians or families wish to consent to such discharge or transfer.

142.     Plaintiffs are entitled to the following additional declaratory and injunctive relief:

(a) directing Defendants to abide by treatment plans independently prepared by Plaintiffs' respective treating professionals, without regard for the Defendants' political plan to downsize or close any developmental centers, and documented in their respective multidisciplinary evaluations (known as Individual Habilitation Plans, IHPs, at NJDC and WDC).

(b) Permitting each Plaintiff to choose:

(i)  to accept or reject the recommendation of the multidisciplinary evaluation; and

(ii) to receive treatment in accordance with the independent recommendations of the multidisciplinary evaluation, either at his/her current residence, another state operated ICF/IID facility, or non-ICF/IID certified setting, as the Plaintiff deems appropriate.

## SECOND CAUSE OF ACTION

## REHABILITATION ACT VIOLATIONS

143.    Plaintiffs' incorporate paragraphs one (1) through one hundred forty-two (142) herein by reference as though fully set forth.

144.    Section 504 of the Rehabilitation Act states that "[n]o otherwise qualified person with disabilities shall, solely by reason of his or her disability, be excluded from participation in, be denied benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance." 29 U.S.C. § 794(a).

145.    Each named Plaintiff and class member is a "qualified person with disabilities" within the meaning of Section 504, because they (1) have physical and/or mental impairments that substantially limit one or more major life activities; and (2) meet the essential eligibility requirements for long term care under New Jersey's Medicaid program and are thus "qualified."

146.    Regulations implementing Section 504 require that a public entity administer its services, programs and activities in "the most integrated setting appropriate" to the needs of qualified individuals with disabilities. 28 CFR § 41.51(d).

147.    Section 504's regulations prohibit recipients of federal financial assistance from utilizing criteria or methods of administration:

44

(a) that have the effect of subjecting qualified handicapped persons to

discrimination on the basis of handicap [or]

(b) that have the purpose or effect of defeating or substantially impairing

accomplishment of the objectives of the recipient's program with respect to

handicapped persons.

148.    Defendants have required that Plaintiffs be discharged or transferred from North Jersey or Woodbridge Developmental Centers to other settings in violation of Section 504's integration mandate.

149.    Further, Defendants have utilized criteria and methods of administration that subject Plaintiffs and class members to discrimination on the basis of disability, by (1) failing to assess properly the services and supports that would enable Plaintiffs to receive services and treatment in the most appropriate settings for their needs, (2) failing to develop proper individualized transition plans, (3) failing to allow guardians to be a meaningful part of the planning process, (4) failing to inform Plaintiffs of all of their options for receiving services, and (5) allocating resources for non-ICF/IID care contrary to the desires and needs of people with disabilities.

150.    The Plaintiffs are entitled to injunctive and declaratory relief that the Defendants shall not discharge or transfer them from their current residences without meeting the requirements that:

(a) such discharge or transfer will not result in Plaintiffs receiving treatment and

services in a setting more restrictive of their rights than their current

placement;

(b) such discharge or transfer will not be recommended by treating professionals unless the treating professionals conclude that such a placement is in the best interests of the individual Plaintiffs and is most appropriate to meet their needs; and

(c) the Plaintiffs by their guardians or families wish to consent to such discharge or transfer.

151.   Plaintiffs are entitled to the following additional declaratory and injunctive relief:

(a) directing Defendants to abide by treatment plans independently prepared by Plaintiffs' respective treating professionals, without regard for the Defendants' political plan to downsize or close any Developmental Centers, and documented in their respective multidisciplinary evaluations (known as IHPs at NJDC and WDC).

(b) permitting each Plaintiff to choose:

(i)  to accept or reject the recommendation of the multidisciplinary evaluation; and

(ii) to receive treatment in accordance with the independent recommendations of the multidisciplinary evaluation, either at his/her current residence, another state-operated ICF/IID facility, or non-ICF/IID certified setting, as the Plaintiff deems appropriate.

## THIRD CAUSE OF ACTION

## MEDICAID ACT AND REGULATORY VIOLATIONS

152.    Plaintiffs' incorporate paragraphs one (1) through one hundred fifty-one (151) herein by reference as though fully set forth.

153.    The State of New Jersey has voluntarily assumed certain obligations under federal law in return for federal funding under the Medical Assistance Program authorized by 42 U.S.C. § 1396, et seq.

154.    Those obligations include:

(a) choice of an ICF/IID institutional placement, subject to a hearing, under 42 U.S.C. § 1396n and 42 CFR § 441.302(d);

(b) provision of ICF/IID services under 42 U.S.C. §§ 1396a(a)(10) and 1396d(a)(l5);

(c) competent evaluation for placement in an institutional ICF/IID facility under 42 CFR § 483.440(b)(3);

(d) a continuous active treatment program as defined in 42 CFR § 483.440(a)(1).

155.    All Plaintiffs receive assistance under the Medical Assistance Program and are owed the duties stated in the preceding paragraph.

156.    Defendants have an obligation to ensure that Plaintiffs' needs and preferences are being met in their multidisciplinary plan.

157.    Defendants have failed to ensure that Plaintiffs' needs and preferences are being met in their multidisciplinary plan.

158.    Defendants are violating their duties to Plaintiffs under the Medical Assistance Program by their acts and omissions alleged above.

159.    Plaintiffs are entitled to declaratory and injunctive relief as to the following:

(a) such discharge or transfer will not result in Plaintiffs receiving treatment and services in a setting more restrictive of their rights than their current placement;

(b) such discharge or transfer will not be recommended by treating professionals unless the treating professionals conclude that such a placement is in the best interests of the individual Plaintiffs and most appropriate to meet their needs;

(c) the Plaintiffs by their guardians or families wish to effect such discharge or transfer; and

(d) the State must comply at the developmental centers with all the regulatory standards contained in Title 42 of the Code of Federal Regulations.

(e) the services and care provided by the State at the developmental centers must meet or exceed accepted professional standards, and must be maintained at a level at least equal to the care and services that preceded the decision to close the developmental centers; and

(f) the State must maintain staffing levels for direct care staff and treating professionals at a level that meets or exceeds accepted professional standards, and at a level at least equal to the staffing that preceded the decision to close the developmental centers;

(g) the State cannot move residents to other ICF's/IID where their needs cannot be adequately met, including, but not limited to, the State cannot move residents to an ICF/IID that is so significantly distant from their families and guardians that any individual resident will be harmed in his care, treatment, habilitation, or psychological well-being.

(h) the services and care provided by the State at the developmental centers must meet or exceed accepted professional standards, and must be maintained at a level at least equal to the care and services that preceded the decision to close the developmental centers; and

(i) the State must maintain staffing levels for direct care staff and treating professionals at a level that meets or exceeds accepted professional standards, and at a level at least equal to the staffing that preceded the decision to close the developmental centers;

(j) the State cannot move residents to other ICF's/IID where their needs cannot be adequately met, including, but not limited to, the State cannot move residents to an ICF/IID that is so significantly distant from their families and guardians that any individual resident will be harmed in his care, treatment, habilitation, or psychological well-being.

160. Plaintiffs are entitled to the following additional declaratory and injunctive relief:

(a) directing Defendants to abide by treatment plans independently prepared by Plaintiffs' respective treating professionals, without regard for the Defendants' mandate to downsize or close any developmental centers, and documented in their respective multidisciplinary evaluations (known as IHPs at the NJDC and WDC).

(b) permitting each Plaintiff to choose:

(i) to accept or reject the recommendation of the multidisciplinary evaluation; and

(ii) to receive treatment in accordance with the independent recommendations of the multidisciplinary evaluation, either at his/her current residence, another state operated ICF/IID, or non-ICF/IID certified setting, as the Plaintiff deems appropriate.

## FOURTH CAUSE OF ACTION

## CONSTITUTIONAL DUE PROCESS VIOLATIONS

161.     Plaintiffs' incorporate paragraphs one (1) through one hundred sixty (160) herein by reference as though fully set forth.

162.     At all relevant times, Defendants were "persons" under 42 U.S.C. § 1983.

163.     At all relevant times, Defendants were acting "under color of state law" under 42 U.S.C. § 1983.

164.     At all relevant times, a "special relationship" existed between each of the Plaintiffs and the State and state actors that were responsible for their safety.

165.     The Defendants have demonstrated a pattern or practice of egregious and flagrant acts or omissions which violate federal rights of the WDC and NJDC residents, rights which are protected by the Fourteenth Amendment to the Constitution of the United States.

166.     The Plaintiff residents will suffer irreparable harm if they are deprived the rights, privileges and immunities provided by the Fourteenth Amendment and federal law.

167.     Defendants, while acting under color of state law, unlawfully, intentionally, unreasonably, maliciously and with deliberate and/or reckless indifference to the Plaintiffs' substantive due process rights secured to Plaintiffs under the Fourth and/or Fourteenth Amendments to the United States Constitution, in violation of 42 U.S.C. § 1983 et. seq. and

similar provisions of federal, state and/or local law, violated Plaintiffs' rights as alleged above and as follows.

168.     The Plaintiffs have significant mental, intellectual, physical and behavioral health issues.  They are unable to verbally articulate their medical and personal needs.  Most of them have very limited mobility, and some have none.  They are unable to care for themselves in even the most basic ways.  They are at the mercy of the persons who provide them with care.  Without the regulatory guarantees provided by an ICF/IID facility, they are defenseless against many forms of abuse and neglect which can lead to their injury or death.

169.     Before becoming residents at NJDC or WDC, some Plaintiffs were abused and neglected in the same types of "community" settings Defendants intend to force Plaintiffs into now.

170.     Defendants know or should know that placing the Plaintiffs in other settings, including non-ICF/IID settings will substantially increase their likelihood of injury and death from abuse, neglect, error, lack of appropriate services, and other causes.

171.     Defendants' failure to provide adequate safeguards to prevent such harm is a violation of Plaintiffs' constitutional right not to be deprived of life or liberty without due process of law.

172.     Defendants' discharge process and procedure, instituted in the efforts to close NJDC and WDC, has resulted in harm to the residents.  Loss of services, loss of staff, and reconfiguration of living units has resulted in harm to the residents.  Defendants have failed to protect residents from harm.

173.    The actions of the Defendants herein have significantly contributed to and increased the vulnerability of the Plaintiffs and created risks that would not have otherwise existed if Defendants complied with their legal duties.

174.    Defendants' actions and inactions constitute a violation of Plaintiffs' federal rights, as protected by the Fourteenth Amendment to the Constitution of the United States and other federal laws.  Unless restrained by this Court, Defendants will continue to engage in their misbehavior, which deprives the Plaintiffs of rights, privileges and immunities secured by the Constitution of the United States and federal law, and will cause irreparable harm to these residents.

175.    The harm ultimately caused or to be caused to the Plaintiffs was and is foreseeable and sufficiently direct.

176.    Plaintiffs are entitled to declaratory and injunctive relief directing that:

(a)  such discharge or transfer will not result in Plaintiffs receiving treatment and services in a setting more restrictive of their rights than their current placement;

(b)  such discharge or transfer will not be recommended by treating professionals unless the treating professionals conclude that such a placement is in the best interests of the individual Plaintiffs;

(c)  such discharge or transfer will not occur unless the Plaintiffs, by their guardians or families, wish to effect such discharge or transfer;

(d)  the services and care provided by the State at the developmental centers must meet or exceed accepted professional standards, and must be maintained at a

level at least equal to the care and services that preceded the decision to close

the developmental centers; and

(e) the State must maintain staffing levels for direct care staff and treating

professionals at a level that meets or exceeds accepted professional standards,

and at a level at least equal to the staffing that preceded the decision to close

the developmental centers;

(f) the State cannot move residents to other ICF's/IID where their needs cannot be

adequately met, including, but not limited to, the State cannot move residents

to an ICF/IID that is so significantly distant from their families and guardians

that any individual resident will be harmed in his care, treatment, habilitation,

or psychological well-being.

177.    Plaintiffs are entitled to the following additional declaratory and injunctive relief:

(a) directing Defendants to abide by treatment plans independently prepared by

Plaintiffs' respective treating professionals, without regard for the

Defendants' political plan to downsize or close any developmental centers,

and documented in their respective multidisciplinary evaluations (known as

IHPs at NJDC and WDC).

(b)  permitting each Plaintiff to choose:

(i)  to accept or reject the recommendation of the multidisciplinary evaluation;

and

(ii) to receive treatment in accordance with the independent recommendations

of the multidisciplinary evaluation, either at his/her current residence,

another state operated ICF/IID facility, or non-ICF/IID certified setting, as the Plaintiff deems appropriate.

## CONCLUSION

WHEREFORE Plaintiffs seek:

(a)     Declaratory and injunctive relief as set forth herein.

(b)     An award to Plaintiffs' of reasonable attorneys' fees, litigation expenses, .and costs; and

(c)     Any other relief this Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury.

Respectfully submitted,

/s/ Thomas A. Archer
Thomas A. Archer
NJ Attorney I.D. 054321994
3401 North Front Street
Harrisburg, PA 17110-0950
(717) 232-5000
Fax:  (717) 236-1816
taarcher@mette.com

THE YORK LEGAL GROUP, LLC

/s/ Thomas B. York
Thomas B. York
PA Attorney I.D. No. 32522
3511 North Front Street
Harrisburg, PA  17110
(717) 236-9675
Fax:  (717) 236-6919

tyork@yorklegalgroup.com

*Attorneys for Plaintiffs*

Date:   June 5, 2013