NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

---

ROSEMARY SCIARRILLO, by and
through her guardians, Joanne St. Amand
and Anthony Sciarrillo, et al.,

         Plaintiffs,

         v.

CHRISTOPHER CHRISTIE, Governor of
the State of New Jersey, et al.,

         Defendants.

Civil Action No. 13-03478 (SRC)

OPINION

**CHESLER**, District Judge

This putative class action, filed by thirty-five developmentally disabled individuals ("Plaintiffs") who currently receive services at two state-run developmental centers, seeks to prevent the State from closing those centers and moving Plaintiffs to other treatment facilities. The Complaint asserts causes of action under three federal statutes – the Americans with Disabilities Act ("ADA"), the Rehabilitation Act ("RA"), and the Social Security Act – as well as a § 1983 constitutional due process claim. Defendants[1] have filed a motion to dismiss these claims, pursuant to Federal Rule of Civil Procedure 12(b)(6). [Docket Entry 4.] Plaintiffs oppose. [Docket Entry 13.] In addition, the United States of America has filed a Statement of Interest, pursuant to 28 U.S.C. § 517, which argues that Plaintiffs have failed to state ADA and

---

[1] The Complaint names seven Defendants: Christopher Christie; the New Jersey Department of Human Services ("NJ DHS"); Jennifer Velez, Commissioner of the NJ DHS; the New Jersey Department of Human Services Department of Developmental Disabilities ("NJ DDD"); Dawn Apgar, Deputy Commission of the NJ DHS; North Jersey Developmental Center ("NJDC"); and Woodbridge Developmental Center ("WDC"). This Opinion uses the terms "Defendants" and "State" interchangeably.

RA causes of action. [Docket Entry 7.] The Court has considered these submissions, and will rule on the motion without oral argument, pursuant to Federal Rule of Civil Procedure 78. For the reasons that follow, Defendants' motion will be granted, and the Complaint will be dismissed with prejudice.

**I.      Background**

This lawsuit arises out of the State of New Jersey's decision to close two state-run residential care facilities for the developmentally disabled, Woodbridge Developmental Center ("WDC") in Middlesex County and North Jersey Developmental Center ("NJDC") in Passaic County. (See Compl. at ¶¶ 121-22.) In broad terms, the Complaint alleges that Defendants are "downsize[ing] or depopulate[ing]" the NJDC and the WDC "without regard to the needs of the individual Plaintiffs," who are all profoundly disabled adults residing at one of the two Centers. (See id. at ¶ 119.) According to the Complaint, Defendants plan to move Plaintiffs out of WDC and NJDC; to this end, Defendants have offered Plaintiffs the choice between a "community placement" – *i.e.*, "small group homes, nursing homes, and other settings with smaller populations" – and a move to a different Developmental Center located "over one hundred miles away." (Id. at ¶¶ 110, 118(d).) Being moved out of the NJDC and WDC will result in the denial to Plaintiffs of "access to their current high level of treatment and services," (id. at ¶ 130), and the decision to close the two Centers has exposed or will expose Plaintiffs to a "significant risk of harm." (Id. at ¶ 90.)

By this lawsuit, Plaintiffs' ask the Court to prevent their relocation, as well as the relocation of a class of similarly situated individuals who have been residents of NJDC or WDC since August 1, 2012. Applying language from the Supreme Court's decision in Olmstead v. L.C. ex rel. Zimring, 527 U.S. 581 (1999), Plaintiffs argue that an involuntary transfer out of

2

NJDC or WDC constitutes discrimination in violation of Title II of the ADA, 42 U.S.C. § 12131, as well as § 504 of the RA, 29 U.S.C. § 794(a). According to Plaintiffs, Olmstead provides them a right to oppose the State of New Jersey's decision to move them from institutional care to a more integrated community setting. (See Compl. ¶ 132-35 ("there is no 'federal requirement that community-based treatment be imposed on patients who do not desire it'" (quoting Olmstead, 527 U.S. at 602).)

Plaintiffs also seek relief pursuant to (1) the Medicaid portions of the Social Security Act and related regulations, and (2) the Due Process Clause of the Fourteenth Amendment. As to the former, the Complaint alleges that Medicaid provides Plaintiffs with a host of rights – including the right to oppose a "discharge or transfer" from NJDC or WDC – and also prevents Defendants from moving Plaintiffs to facilities that are "significantly distant" from family members or guardians. (See id. at 47-50.) As to the latter, the Complaint alleges what amounts to two separate theories of liability. First, Defendants will violate Plaintiffs' substantive due process rights by moving Plaintiffs to non-institutionalized residences that will "substantially increase [Plaintiffs'] likelihood of injury and death from abuse, neglect, error, lack of appropriate services, and other causes." (See id. ¶¶ 168-71.) Second, Defendants have violated Plaintiffs' substantive due process rights by providing inferior care for Plaintiffs' safety and well-being during the downsizing of NJDC and WDC. (See id. ¶¶ 172-74.)

## II. Discussion

### A. Legal Standard

A complaint will survive a motion under Rule 12(b)(6) only if it states "sufficient factual allegations, accepted as true, to 'state a claim for relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic v. Twombly, 550 U.S. 554, 570 (2007)).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (citing Twombly, 550 U.S. at 556). Following Iqbal and Twombly, the Third Circuit has held that, to prevent dismissal of a claim, the complaint must show, through the facts alleged, that the plaintiff is entitled to relief. Fowler v. UPMC Shadyside, 578 F.3d 203, 211 (3d Cir. 2009). While the Court must construe the complaint in the light most favorable to the plaintiff, it need not accept a "legal conclusion couched as factual allegation." Baraka v. McGreevey, 481 F.3d 187, 195 (3d Cir. 2007); Fowler, 578 F.3d at 210-11; see also Iqbal, 556 U.S. at 679 ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations."). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, will not suffice." Iqbal, 556 U.S. at 678.

### B. The ADA and Rehabilitation Act Claims[2]

The ADA was enacted in 1990 "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b). The ADA recognizes that "historically, society has tended to isolate and segregate individuals with disabilities, and despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem." Id. § 12101(a)(2). Consistent with this statement of purpose, Title II of the ADA prohibits discrimination against individuals with disabilities by public entities: "no qualified individual with a disability shall, by reasons of such disability, be excluded from participation in or be

---

[2] The parties treat the ADA and Rehabilitation Act claims as interchangeable for purposes of this motion. This Court will do the same. See Olmstead, 527 U.S. at 590-92 (noting the similarities between 42 U.S.C. § 12131 and the RA and that the regulations implementing § 12131 are modeled after those implementing § 504 of the RA); Frederick L. v. Dep't of Pub. Welfare of Commonwealth of Pa., 364 F.3d 487, 490 n.2 (3d Cir. 2004) (acknowledging the "congruence" of the ADA and RA "integration mandates").

4

denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." Id. § 12132. Title II's integration regulation, promulgated by the Attorney General, requires public entities to "administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d). The "most integrated setting" is defined as one that "enables individuals with disabilities to interact with nondisabled persons to the fullest extent possible . . . ." 28 C.F.R. Pt. 35, App. B at 673.

In <u>Olmstead v. L.C. ex rel. Zimring</u>, the Supreme Court addressed the question of whether the ADA's "proscription of discrimination may require placement of persons with mental disabilities in community settings rather than institutions." 527 U.S. at 587. The Court held that the answer to that question was a qualified yes: under Title II "[u]njustified isolation" in an institution can, in certain circumstances, be "properly regarded as discrimination based on disability." 527 U.S. at 597. The Court provided a three factor analysis to determine when a State must place a mentally disabled individual in a community setting, as opposed to an institution:

> [1] when the State's treatment professionals have determined that community placement is appropriate, [2] the transfer from institutional care to a less restrictive setting is not opposed by the affected individual, and [3] the placement can be reasonably accommodated, taking into account the resources available to the State and the needs of others with mental disabilities.

<u>Id.</u>

In support of its holding, the Court noted the shift in congressional policy towards treating disabled individuals in "state-run home and community based care," and away from institutionalized treatment. <u>See id.</u> at 601 (stating that Medicaid provides funding for such programs through a waiver and that the Department of Health and Human Services encourages

5

states "to take advantage of the waiver program"). But the Court, in dicta, was careful to observe that (1) "nothing in the ADA or its implementing regulations condones" forcing disabled persons into community settings when they are "unable to handle or benefit" from them, and (2) there is no "federal requirement that community-based treatment be imposed on patients who do not desire it." See id. at 601-02; see also id. at 604 ("the ADA is not reasonably read to impel States to phase out institutions, placing patients in need of close care at risk"). To this end, Olmstead instructed States to rely on "the reasonable assessments" of their own treating professionals to determine if disabled individuals are eligible for "habilitation in a community-based program." Id. at 602.

Olmstead thus stands for the proposition that "it is a violation of the [ADA, the RA,] and their implementing regulations to force developmentally disabled patients to reside in institutions when they are able and willing to live" in more integrated community settings. See Benjamin ex rel. Yock v. Dep't of Pub. Welfare of Pa., 701 F.3d 938, 942 (3d Cir. 2012). To substantiate their ADA and RA claims, however, Plaintiffs seize on the above dicta and argue that Olmstead stands for a somewhat related but entirely distinct proposition – that a State cannot move a developmentally disabled person from their current institution to a community setting unless the Supreme Court's three-factor analysis is met. (See Opp. Br. at 15-16). In Plaintiffs' view, the State of New Jersey cannot close the NJDC or WDC until every resident at those facilities consents to a transfer and a treatment professional has determined that another facility – institutional or community-based – is "the most appropriate place to receive services." (See id. at 15.)[3]

---

[3] Plaintiffs argue that they do not seek to prevent the State of New Jersey from closing the NJDC and WDC, and instead seek enforcement of "rights [that] may prevent the move of some residents from [WDC] and [NJDC] . . . ." (See Opp. Br. at 2.) This is a distinction without a

6

Plaintiffs' interpretation of Olmstead is untenable. Simply put, "there is no basis [in Olmstead] for saying that a premature discharge into the community is an ADA *discrimination* based on disability." Richard S. v. Dep't of Developmental Servs. of the State of Cal., No. 97-cv-219, 2000 WL 35944246, at *3 (C.D. Cal. Mar. 27, 2000) (emphasis in original). Indeed, "[t]here is no ADA provision that *providing* community placement is a discrimination. It may be a bad medical decision, or poor policy, but it is not discrimination based on disability." Id. (emphasis in original). This Court will therefore join the numerous other federal courts have rejected similar "obverse Olmstead" arguments in circumstances where a State has decided to close treatment facilities for the developmentally disabled or relocate such disabled individuals to community settings. See, e.g., Richard C. ex rel. Kathy B. v. Houstoun, 196 F.R.D. 288, 292 (W.D. Pa. 1999) (rejecting interpretation of Olmstead identical to the one proffered in this case and finding that "it does not logically follow [from Olmstead] that institutionalization is required if any of the three Olmstead criteria is not met"); Ill. League of Advocates for the Developmentally, Disabled v. Quinn, No. 13-cv-1300, 2013 WL 3168758, at *5 (N.D. Ill. June 20, 2013) (noting, in case brought to enjoin the State of Illinois from closing development centers, that "[u]njustified isolation constitutes discrimination under the ADA, but" Olmstead does not mean the converse is true).[4]

---

difference, as the practical result of Plaintiffs successfully enjoining the State from moving residents out of the Centers would obviously force those Centers to remain open.

[4] The Third Circuit, in the context of a motion for intervention under Federal Rule of Civil Procedure 24, has "assum[ed], without deciding" that a group of institutionalized mentally disabled individuals who oppose community placement "ha[s] a legally enforceable right to remain in the institution where they currently reside." See Benjamin ex rel. Yock v. Dep't of Pub. Welfare of Pa., 432 F. App'x 94, 98 & n.4 (3d Cir. 2011) (denying Rule 24 intervention). In a later decision in the Benjamin litigation, the Third Circuit granted the Rule 24 intervention of the same group of individuals at the remedy stage, holding that the "protectable interests" of institutionalized individuals "may be affected" by a Settlement Agreement that fosters integration through institutional discharge. See 701 F.3d at 957 (3d Cir. 2012). But a right sufficient to warrant intervention does not a discrimination cause of action make. Absent more

The Court is sensitive to the difficulties faced by institutionalized individuals and their families; for instance, it appears from the Complaint that Plaintiffs and their families have grown accustomed to receiving state-provided care at the two institutions New Jersey has marked for closure. Plaintiffs' concerns, however, are concerns which are appropriately directed to the State agencies involved. The Court's analysis is limited to whether the controlling statutes relied upon by Plaintiffs have been violated, and it does not appear that Plaintiffs' relocation amounts to discrimination on the basis of disability in violation of federal law. As such, the Complaint fails to state a claim for violation of the ADA and RA, and those causes of action must be dismissed.

C.     **The Medicaid Claim**

The Complaint also alleges that relocating residents of NJDC and WDC violates several provisions of the Social Security Act's Medicaid portions and their implementing regulations. The Complaint cites six provisions of the United States Code and the Code of Federal Regulations: 42 U.S.C § 1396n; 42 C.F.R. § 441.302(d); 42 U.S.C. § 1396a(a)(10); 42 U.S.C. § 1396d(a)(15); 42 C.F.R. § 483.440(b)(3); and 42 C.F.R. § 483.440(a)(1). Plaintiffs allege that this laundry list of statutes and regulations hangs upon Defendants various duties, which will all be violated by relocating Plaintiffs from NJDC and WDC.

The Medicaid claim must fail. Save for the rights contemplated by 42 U.S.C. §§ 1396a(a)(10) and 1396d(a)(15), Plaintiffs do not cite a provision of Medicaid that they can enforce through a private 42 U.S.C. § 1983 cause of action. See <u>Sabree ex rel. Sabree v. Richman</u>, 367 F.3d 180, 182-83 (3d Cir. 2004) ("[i]n legislation enacted pursuant to the spending power, the typical remedy for state noncompliance with federally imposed conditions is not a

---

direct guidance from the Third Circuit, the Court will follow the plain language of the <u>Olmstead</u> decision itself and the other federal courts that have applied <u>Olmstead</u> to reject ADA arguments identical to the one currently before the Court.

private cause of action for noncompliance but rather action by the Federal Government to terminate funds to the State" (quoting Pennhurst State Sch. & Hosp. v. Halderman, 451 U.S. 1, 28 (1981))).[5] It is Plaintiffs' burden to establish that the federal statute cited "gives rise to federal rights enforceable through § 1983." Grammer v. John J. Kane Regional Centers-Glen Hazel, 570 F.3d 520, 525 (3d Cir. 2009). But Plaintiffs' Opposition brief makes no argument whatsoever as to whether the litany of Medicaid statutes and regulations cited in the Complaint individually pass a Gonzaga University v. Doe analysis and can therefore be enforced privately pursuant to § 1983. See Sabree, 367 F.3d at 183 (quoting Gonzaga Univ. v. Doe, 536 U.S. 273 (2002)).

If §§ 1396a(a)(10) and 1396d(a)(15) were applicable to this case the outcome might be different, insofar as the Third Circuit has explicitly held that those subsections are privately enforceable in § 1983 suits. See Sabree, 367 F.3d at 183. But the two provisions are not relevant here. Section 1396a(a)(10) requires "[a] State plan for medical assistance" to provide . . . for making medical assistance . . . available, . . . to all [eligible] individuals . . . ." Nowhere in the Complaint do Plaintiffs allege that the State is not making medical assistance available to them. Instead, the Complaint takes issue with the type of medical assistance allegedly provided at facilities other than NJDC and WDC.

Likewise, § 1396d(a)(15) requires states to provide medical assistance in the form of payment for at least some of the "services [received by individuals] in an intermediate care facility" for the developmentally disabled. Again, the Complaint does not say that Defendants are violating federal law by failing to pay for intermediate care facilities like NJDC and WDC,

---

[5] Indeed, Plaintiffs fail to bring their Medicaid claim pursuant to 42 U.S.C. § 1983, the vehicle provided by Congress for private vindication of rights that may be created by statutes such as Medicaid. See Sabree, 367 F.3d at 183. Having found the Medicaid claim is meritless, the Court will proceed as if Plaintiffs have properly brought suit pursuant to § 1983.

9

only that Plaintiffs have a federal right to the intermediate care facility of their choosing. Indeed, Plaintiffs argue that "Defendants have no right to assume all [intermediate care facilities] are equal or provide necessary services." (Opp. Br. at 20.) But all that § 1396d(a)(15) requires is for the State of New Jersey to pay for some or all of the services provided to disabled individuals at such facilities, not to offer disabled individuals a choice to receive care at the facility that they perceive to be superior.

In sum, Plaintiffs' Medicaid claim relies on federal law that is not enforceable in private lawsuits and statutes that are irrelevant to the complained of conduct. It will therefore be dismissed.

### D. The Due Process Claim

Plaintiffs final claim is one for injunctive relief under 42 U.S.C. § 1983; it alleges that the decision to close NJDC and WDC and relocate Plaintiffs from their residences there violates Plaintiffs' substantive due process rights. To state a cause of action under § 1983, a plaintiff must "allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." West v. Atkins, 487 U.S. 42, 48 (1988). The Complaint and both parties' briefs treat the due process claim as one that rests solely on the substantive due process rights to protection and care enunciated in Youngberg v. Romeo, 457 U.S. 307 (1982).

In Youngberg, the Supreme Court addressed "the substantive [due process] rights of involuntarily committed" developmentally disabled individuals. Id. at 314. Youngberg held that "these substantive rights include a qualified right to safe conditions and freedom from bodily restraint." Fialkowski v. Greenwich Home for Children, Inc., 921 F.2d 459, 465 (3d Cir. 1990). Of course, due process "generally confer[s] no affirmative right to governmental aid." See

10

DeShaney v. Winnebago Cty. Dep't of Soc. Servs., 489 U.S. 189, 196 (1989). Youngberg rights, however, "fit within an exception providing that 'when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being.'" Torisky v. Schweiker, 466 F.3d 438, 444 (3d Cir. 2006) (quoting DeShaney, 489 U.S. at 199-200). As stated earlier, a fair reading of the Complaint reveals that Plaintiffs in fact bring two separate but related Youngberg claims – for harm that might arise if Plaintiffs are transferred to community-based facilities, and for harm that has already occurred based on inadequate staffing at NJDC and WDC.

The due process claim fails under either theory. Plaintiffs cannot state a plausible Youngberg claim based on speculative future harm that might result if Plaintiffs are placed in community-based settings. (See Compl. ¶¶ 168-71.) Such a result is foreclosed by Fialkowski, in which the Third Circuit held that a developmentally disabled individual did not have his "personal liberty . . . substantially curtailed by the state" in a manner sufficient to implicate Youngberg when the individual was moved from a state institution to a group home and choked to death at that location. See 921 F.2d at 465. In support of its holding, the Fialkowski Court noted that the individual's family "could remove their son from the [group home] if they wished" and that the individual "himself enjoyed considerable freedom of movement." See id. at 465-66. There is no indication from the Complaint or otherwise that identical considerations would not govern here. Thus, any harm that might occur to Plaintiffs in a group home setting would not be harm visited while Plaintiffs were "deprived of freedom 'through . . . institutionalization or other similar restraint of personal liberty,'" and thus would not be actionable under the Due Process Clause. See id. at 466 (quoting DeShaney, 489 U.S at 200); see also Campbell v. State of Wash. Dep't of Soc. and Health Servs., 671 F.3d 837, 843-45 (9th Cir. 2011) (holding that a mentally

11

disabled adult's residence in a state-run alternative-living facility is not involuntary confinement). In short, the freedom inherent in a community-based residence and the curtailment of personal liberty necessary to state a Youngberg claim are entirely dissimilar. The due process claim, insofar as it seeks liability for harm that might occur while Plaintiffs reside in state-funded community settings, is dismissed.

As to Plaintiffs' second theory, the Complaint fails to plead facts sufficient to make out a plausible Youngberg claim based on the alleged reduction in services at NJDC and WDC. See Iqbal, 556 at 678. Plaintiffs allege that the Defendants "have significantly contributed to and increased the vulnerability of the Plaintiffs [living at NJDC and WDC] and created risks that would not have otherwise existed if Defendants complied with their legal duties." (See Compl. at ¶ 173.) But as Defendants correctly argue, Plaintiffs support their claim with nothing more than "sweeping legal conclusions derived from Youngberg," not specific facts. (Mov. Br. at 20 (noting the allegation that the medical services provided by Defendant have "substantially departed from generally accepted professional standards" (quoting Compl. ¶ 85)).) Such allegations cannot survive a Rule 12(b)(6) motion under contemporary pleading standards.

Plaintiffs' argument to the contrary is baffling. Plaintiffs do not attempt to highlight specific facts to substantiate a plausible claim that the State has failed to confine them under "conditions of reasonable care and safety . . . ." Youngberg, 457 U.S. at 324. Instead, Plaintiffs lift a three-and-a-half page block quote out of their Complaint and insert it into their brief, thereafter noting that "[t]hese allegations are sufficient notice pleading." (Opp. Br. at 23-26.) The Court would overlook this approach, if the block-quoted portion of the Complaint was not rife with the sort of conclusory allegations that cannot serve to state a plausible claim. As just one example, Paragraph 79 states that the "provision of protection from harm mechanisms, since

the decision to close the developmental centers, has in some instances substantially departed from generally accepted professional standards." Indeed, in the nineteen paragraphs of the Complaint reproduced in Plaintiffs' brief, the Court can only find one instance where Plaintiffs allege facts relevant to stating a plausible Youngberg claim. (See Compl. ¶ 89 (describing a physical attack on a Plaintiff by another resident allegedly resulting from "lack of staffing").) But one alleged resident on resident attack does not substantiate a plausible claim for due process violations occurring at two separate state-run facilities that house severely disabled adults.[6]

The Youngberg claim based on current conditions at NJDC and WDC also fails for the distinct reason that the Complaint does not plead facts to indicate that Plaintiffs are in any way involuntarily housed at the two facilities. As stated above, Youngberg rights – *i.e.*, "[t]he affirmative duty to protect" – arise only where the state has taken an "affirmative act of restraining the individual's freedom to act on his own behalf . . . ." See DeShaney, 489 U.S. at 200. Plaintiffs, however, do not argue that Defendants in this case have taken steps to affirmatively confine them to NJDC or WDC. Rather, Plaintiffs argue that they are "totally dependent on the medical and habilitative care provided by the State [at NJDC and WDC], and they cannot decline services at any time without jeopardizing their health, safety, and well-being." (Opp. Br. at 32-33.) To this end, the Third Circuit has indeed recognized, if not held, that otherwise voluntarily committed patients may in certain circumstances "find themselves in a *de facto* involuntary status" for the purposes of Youngberg. See Torisky, 446 F.3d at 447-48 (holding that the trial court erred when it concluded that "the state owes an affirmative due process duty of care to residents of a state institution who are free to leave state custody").

But this case is not one of those circumstances. The Torisky decision, for instance, affirmed an order denying a motion to dismiss where the complaint alleged that the

---

[6] Paragraph 89 in fact fails to state if the alleged attack took place at NJDC or WDC.

13

developmentally disabled plaintiffs were, while in state custody, "separated from their guardians . . . by a police blockade" and were "transferred against their will" by state employees who affirmatively utilized "physical and psychological force . . . ." See id. at 448. The Complaint in this case is bereft of facts that reveal similar affirmative acts of physical or mental restraint by the Defendants or their agents. Torisky itself cites to a case from the First Circuit that analyzes and squarely rejects the theory that an institutionalized individual can be *de facto* involuntarily confined because of the profoundness of his disabilities. See id. at 447 (quoting Monahan v. Dorchester Counseling Ctr., Inc., 961 F.2d 987, 992 (1st Cir. 1992)). Much like Plaintiffs here, the plaintiff in Monahan argued that he was "*de facto* a ward of the state" based on, *inter alia*, his "degree of disability" and "the availability of other resources and of . . . guardians . . . ." See 961 F.2d at 992. The First Circuit, however, rebuffed this argument. The court noted that the complaint did not allege that plaintiff was somehow "barred" from leaving the state facility where he was housed. Monahan found that even if the plaintiff's "mental condition . . . made him functionally dependent on his [state] caretakers . . . it was [plaintiff's] own mental condition alone that impinged upon his freedom to leave." As such, "it was not the state that deprived him of that freedom," and the Constitution therefore "did not impose upon [the state] any responsibility for [plaintiff's] safety and well-being." Id. at 992 (citing DeShaney, 489 U.S. at 199-200); see also Randolph v. Cervantes, 130 F.3d 727, 730 (5th Cir. 1997) ("the mere fact that [plaintiff's] mental condition may have made her functionally dependent on [defendants] does not transform her voluntary tenancy at [a state run apartment] into an involuntary confinement"). Identical considerations govern in this case.

Moreover, the facts that have been plead in the Complaint reveal that, far from being *de jure* or *de facto* involuntary committed to NJDC or WDC, it is Plaintiffs sincere desire to remain

14

at those facilities. (See, e.g., Compl. ¶ 96 ("All Plaintiffs are medically and developmentally most appropriately served at the [NJDC or WDC] instead of any alternative setting.").) Indeed, the relief sought by virtue of the due process claim – as well as all other claims in this case – is an order enjoining the State from moving the Plaintiffs out of NJDC or WDC without their consent. (See Compl. ¶ 176.) It simply cannot be the case that a constitutional right that arises from the state's act of confining an individual at a government facility against his will can be enforced to require the state to keep an individual at a government facility of his choosing. Plaintiffs' due process claim, to the extent that it is based on the living conditions of two state-run facilities where Plaintiffs voluntarily receive state-provided services, fails as a matter of law and is therefore dismissed.[7]

## III. Conclusion

For the foregoing reasons, the Court will grant Defendants' motion [Docket Entry 4], and dismiss the Complaint with prejudice. An appropriate Order will be filed herewith.

          s/ Stanley R. Chesler
          STANLEY R. CHESLER
          United States District Judge

Dated: December 13th, 2013

---

[7] Having found that Plaintiffs fail to state a viable due process claim, the Court need not address Defendant's Burford abstention or Eleventh Amendment immunity arguments. (See Mov. Br. at 26.).

15